Travelers Cas. & Sur. Co. v Vale Can. Ltd. (2025 NY Slip Op 51640(U))

[*1]

Travelers Cas. & Sur. Co. v Vale Can. Ltd.

2025 NY Slip Op 51640(U)

Decided on October 10, 2025

Supreme Court, New York County

Borrok, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on October 10, 2025
Supreme Court, New York County

Travelers Casualty & Surety Company, Plaintiff,

against
Vale Canada Limited, AIU INSURANCE COMPANY, AMERICAN HOME ASSURANCE COMPANY, GRANITE STATE INSURANCE COMPANY, INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA, NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., CGU INTERNATIONAL INSURANCE PLC, F/K/A COMMERCIAL UNION ASSURANCE COMPANY, NORTH RIVER INSURANCE COMPANY, UNITED STATES FIRE INSURANCE COMPANY, EMPLOYERS INSURANCE COMPANY OF WAUSAU, FIREMANS FUND INSURANCE COMPANY, GENERAL REINSURANCE CORPORATION, INDEMNITY INSURANCE COMPANY OF NORTH AMERICA, INSURANCE COMPANY OF NORTH AMERICA, CERTAIN UNDERWRITERS AT LLOYDS, LONDON, ZURICH ASSURANCE LTD. F/K/A MIDLAND ASSURANCE LTD., SOMPO JAPAN NIPPONKOA INSURANCE, INC. F/K/A NIPPON F&M, ALLSTATE NORTHBROOK INDEMNITY COMPANY, F/K/A NORTHBROOK INDEMNITY COMPANY, ROYAL & SUN ALLIANCE INSURANCE COMPANY OF CANADA F/K/A ROYAL INSURANCE COMPANY OF CANADA, JOHN DOE INSURERS 1-10, Defendant.

Index No. 654028/2021

Travelers Casualty & Insurance Company was represented by Day Pitney LLP.
Vale Canada Limited was represented by Pillsbury Winthrop Shaw Pittman LLP.
The North River Insurance Company and United States Fire Insurance Company were represented by Kennedys CMK LLP.

Andrew Borrok, J.

The following e-filed documents, listed by NYSCEF document number (Motion 036) 1574, 1575, 1576, 1577, 1578, 1579, 1580, 1581, 1582, 1583, 1584, 1585, 1586, 1587, 1588, 1589, 1590, 1591, 1592, 1593, 1594, 1595, 1606 were read on this motion to/for MISCELLANEOUS
The following e-filed documents, listed by NYSCEF document number (Motion 038) 1537, 1538, 1539, 1540, 1541, 1542, 1543, 1544, 1545, 1546, 1547, 1571, 1572, 1573, 1607 were read on this motion to/for SUMMARY JUDGMENT(AFTER JOINDER.
Upon the foregoing documents and for the reasons set forth on record (tr. 10.3.25), The North River Insurance Company and United States Fire Insurance Company (collectively, North River and US Fire)'s motion (Mtn. Seq. No. 038) for summary judgment is GRANTED. 
Simply put, and as discussed below, the record before the Court firmly establishes that the Prior Declaration (hereinafter defined) applies to the Remaining Sites (hereinafter defined) such that North River and US Fire have met their burden in demonstrating that the Pollution Exclusion applies and the Sudden and Accidental Exception does not apply and Vale Canada has failed to raise an issue of fact warranting further proceedings (Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]). Vale Canada has adduced no credible evidence that any purported spill resulted in an abrupt (i.e., as opposed to gradual) release of pollutants that caused contamination of the groundwater. They did not before on the prior motion for summary judgment with respect to the Test Sites (hereinafter defined) which Test Sites, and as discussed in the Prior Declaration and below, were supposed to be dispositive of all of the issues in this case. They do not now with respect to the Remaining Sites. 
As discussed below in greater detail on a site-by-site basis, according to Vale Canada's expert Andrew Bittner, the pollution damage occurred over decades, routinely, and year after year, in the course of normal operations at each of the Remaining Sites. Indeed, far from being "sudden and accidental," Mr. Bittner's reports confirms that the pollution releases were "so routine as to be akin to a bread baker spilling flour on the floor, or an Italian restaurant where water with pasta boils over. In the context of their operations, such events were expected and routine — not sudden and accidental, as the law has interpreted those words" (Travelers Indem. Co. v Northrop Grumman Corp., 3 F Supp 3d 79, 110 [SD NY 2014]).[FN1]

Vale Canada's motion (Mtn. Seq. No. 036) seeking to have the Court take judicial notice of the concurrent causation doctrine is DENIED. Both under New York and Ontario law, the first step is to determine what caused the loss (NY Jur.2d Ins. § 1499 [2d ed, May 2025 update ("[I]n determining the cause of a loss for the purpose of fixing insurance liability when concurring causes of damage appear, the proximate cause to which the loss is to be attributed is [*2]or may be the dominant or efficient cause" [emphasis added])]; Derksen v 539938 Ontario Ltd., 2001 SCC 72 ¶¶ 24-37; CCR Fishing Ltd. v British Reserve Ins. Co., [1990] 1 SCR 814, at 815 ["It is my view that the following procedure should be followed in determining whether a loss was proximately causes by a peril of the sea. First, the cause or causes of the loss should be ascertained[.]"]; B&B Optical Mgmt. v Bast et al., 2003 SKQB 242 ¶ 39 ["[T]he proper procedure in determining the applicability of an exclusion clause is to first ascertain the cause or causes of the loss[.]"]). As discussed below (and in Mr. Bittner's report), the one cause that Vale Canada is able to establish is that property damage occurred from metal leaching over decades from operations. Not a sequence of events over a discrete time period in a chain of causation as to anoccurrence where each step is necessary to cause the property damage (Pavlovic v Economic Mutual Insurance Co [1994], 99 BCLR [2d] 298 at paras. 18-22, 25-26). As such, the doctrine of concurrent causation is simply inapplicable.[FN2]

Indeed, the cases cited by Vale Canada indicate that the concurrent causation doctrine applies only when two causes work together to create a loss and where without one of the causes the loss would not have occurred. Vale Canada offers no evidence and Vale Canada's witnesses concede that they can not offer any evidence that the Remaining Sites were not already contaminated before any subsequent spills or what the effect was of any subsequent spill.[FN3]
Stated differently, Vale Canada's concurrent causation argument relies on at least one faulty premise — i.e., that both acid rock drainage/metal leachate and the over 340 releases over the span of a few years contaminated the Remaining Sites.[FN4]
Vale Canada concedes that it "[doesn't] have an investigation . . . that discretely identifies the source [of groundwater contamination]" (NYSCEF Doc. No. 1522 at 447:13-15) such it can establish that any of these subsequent (not concurrent or contemporaneous in time) spills caused the contamination.[FN5]
Thus, the record before the Court as to the Remaining Sites, according to Vale Canada's expert, as with Test Sites, is that the groundwater contamination occurred over decades of time from Vale Canada's operation — i.e., an uncovered occurrence. As such, the doctrine of concurrent causation is inapplicable to the record facts.
Finally, the Court notes that the property damage at issue as to the alleged hundreds of [*3]subsequent (not concurrent or contemporaneous) spills and overflows had already occurred and Vale Canada concedes that the groundwater contamination had or would still have occurred in the absence of such spills and releases (compare NYSCEF Doc. No. 1522 at 442:17-443:11 ["Yes, the groundwater would be impacted if we exclude the spills"],[FN6]
with with B&B 2003 SKQB 242 ¶ 40 ["[B]oththe electricity andthe negligence of the contractor were causes of the loss; in the absence of either, there would have been no loss" (emphasis added)]). As such, the motion seeking the Court to take judicial notice of the inapplicable concurrent causation doctrine is denied.
THE RELEVANT FACTS AND CIRCUMSTANCES
This is a case in which the Insurers [FN7]
sought a declaration that the Pollution Exclusion unambiguously bars recovery for any of Vale Canada's insurance claims at the 27 different sites where Vale Canada has indicated that there is pollution and potential contamination of third-party property for which Vale is legally liable under applicable law (NYSCEF Doc. No. 692).
As discussed in a Decision and Order (NYSCEF Doc. No. 1414; the Prior Declaration) dated February 26, 2025, "four sites were used as an adequate sampling of the sites (i.e., Test Sites) for the purpose of discovery and application of the rulings . . . [of the Prior Declaration] . . . as to all 27 sites in determining whether Vale Canada has coverage under the Policies" (id.). Vale Canada and the Insurers were each permitted to pick two sites as samples for discovery and for the Court's review. Vale Canada selected the Pipe Mine and Chicago Mine sites. The Insurers selected the Copper Cliff Smelter and the Thompson Complex sites.
As discussed in the Prior Declaration, the critical issue is whether the Sudden and Accidental Exception to the Pollution Exclusion applies such that Vale Canada has coverage under the Policies. As the Court previously explained, under New York law, an insurer bears the initial burden of demonstrating that the underlying property damage in a claim is "attributable to the discharge or release of a pollutant into the environment" (Northville Indus. Corp. v National Union Fire Ins. Co. of Pittsburgh, Pa., 89 NY2d 621, 628, 634 [1997]). Once the insurer makes this showing, "the burden shifts to the insured to demonstrate that the discharge was sudden and accidental" (id. at 634).
The Sudden and Accidental Exception is based on the "initial release of the pollutant, not the length of time the discharge remains undiscovered, nor the length of time the damage to the environment continued as a result of the discharge, nor the timespan of the eventual dispersal of [*4]the discharged pollutant into the environment" (id. at 633). As such, the exception "cannot be established merely by showing that the release of pollutant had its onset at some particular point in time and, in that sense, the discharge could be said to have begun abruptly" (id.). "Rather, the temporal element aspect of the sudden discharge element would only be met by the discharge, abruptly or within a short timespan, of a significant quantity of pollutant sufficient to have some potentially damaging environmental effect" (id. at 634).
As discussed in the Prior Declaration, the Insurers previously moved for summary judgment on the basis that the Pollution Exclusion contained in each of the Policies clearly and unambiguously bars recovery for any of Vale Canada's coverage claims for the Test Sites because it is undisputed that the pollutant damage for which Vale Canada claims coverage arise out of the gradual discharge, release or dispersal of pollutants over the course of many decades such that it cannot be said that the pollution was "sudden" within the meaning of the Sudden and Accidental Exception to the Pollution Exclusion. 
In support of their position, the Insurers adduced, among other things, (i) Vale Canada's claim notice to Travelers (NYSCEF Doc. No. 692), in which Vale Canada admits that its "historical and current operations in these locations may have given rise to the pollution or contamination of third-party property for which Vale is legally liable under applicable law" (id. at 1) and (ii) Value Canada's interrogatory responses (NYSCEF Doc. No. 63) in which Vale Canada described its claims for the Test Sites as relating to actual or alleged contamination from the leaching of metal particulates over decades as a result of a phenomenon known as acid rock drainage into groundwater (e.g., id. at 10, 23).[FN8]
In addition, Lisa Lanteigne,[FN9]
was unable to [*5]identify a "sudden" event that caused the groundwater damage (NYCEF Doc. No. 694 at 296:16-298:22). Thus, and because the language of the Policy is clear and unambiguous, the Insurers argued that they have met their prima facie entitlement to summary judgment that there are no issues of fact as to whether the decades-long consequential pollution at issue in this case falls under the Sudden and Accidental Exception such that coverage is not excluded by the Pollution Exclusion.
In their opposition papers, Vale Canada argued that the Court must conduct a choice of law analysis to determine whether the Policies are subject to Ontario law, as contended by Vale Canada, or New York law, as contended by the Insurers. More specifically, Vale Canada argued (i) Canadian courts must follow "horizontal stare decisis," (ii) the relevant controlling authority is Zatko v. Paterson Spring Service Ltd. (1985)[FN10]
and (iii) Ms. Lanteigne who identified spillage in the Copper Cliff Smelter site reports (NYSCEF Doc. No. 1141) and that the consequential groundwater pollutant falls within the Sudden and Accidental Exception to the Pollution Exclusion.
For the reasons set forth in the Prior Declaration, the Court held that the Insurers met their prima facie burden of entitlement to summary judgment and that Vale Canada failed to raise an issue of material fact warranting further proceeding holding that Vale Canada does not have coverage under the Policies (Alvarez v Prospect Hosp., 68 NY2d at 324, citing Winegrad v New York Univ. Med. Ctr., 64 NY2d 851, 853 [1985]; Stonehill Capital Mgt., LLC v Bank of the W., 28 NY3d 439, 448 [2016]). 
Among other things, the Court held that (i) even if the Court were to apply Zatko instead of the later decided BP Can. Inc. v Comco Serv. Station Contrs. & Maint. Ltd., 1990 Carswell Ont 637 (Can Ont HCJ 1990) or New York law, the consequential pollutant after Vale Canada knew of the spillage and made whatever remedial decisions that it decided to make as to those pollutants would not fall within the Sudden and Accidental Exception to the Pollution Exception, (ii) a choice of law analysis was not appropriate because as Gordon G. Hillicker, K.C., Vale Canada's expert had previously explained in a case captioned Teck Metals Ltd. v Certain Underwriters at Lloyds, 2010 WL 8981695 (ED Wash May 25, 2010), and looking at Ontario authority in opinion at the law in British Columbia , the law in Ontario is unsettled such that Vale Canada failed to present a settled conflict of law warranting a choice of law analysis, and (iii) that even if the Court were to do a choice of law analysis under R. v Sullivan, 2022 SCC 19 and applying "horizontal stare decisis," the Court "must follow the most recent authority unless the [Hansard Spruce Mills] criteria above are met (NYSCEF Doc. No. 1079 ¶ 79), which is BP [*6]and not Zatko, and pursuant to which "sudden and accidental" does not mean merely "unintended." As such, the Court held that under Zatko, BP, or New York law, there is no question that the Sudden and Accidental Exception would not apply and that the Pollution Exclusion would apply such that Vale Canada does not have coverage.
Following the issuance of the Prior Declaration (and notwithstanding the understanding that the Test Sites were to be a proxy for all of the sites such that the Prior Declaration was supposed to apply to all 27 sites),[FN11]
the parties met and conferred as to the applicability of the Prior Declaration to the remaining sites in the case. As relevant, the parties agreed that as to all but six sites, the Prior Declaration applies.[FN12]
As to (1) the Gertrude Mine and Creighton Mine, (2) the Frood-Stobie Mine, (3) the Central Tailings Area, (4) the Copper Cliff Nickel Refinery, (5) the Copper Cliff Copper Refinery and (6) the Port Colborne Refinery (collectively, the Remaining Sites), North River and US Fire believe that the Prior Declaration applies, Vale Canada argues that it does not.[FN13]
As discussed below, North River and US Fire are correct. Vale Canada is not.
(1) the Gertrude Mine and Creighton Mine
The Gertrude Mine and Creighton Mine are located in close proximity to one another (NYSCEF Doc. No. 1524 at 4.13[a]). Both mines began operations over 100 years ago. The Gertrude Mine operated from 1900 to 2013 and the Creighton Mine began operating in 1899 and is scheduled to cease operations in 2028 (id. at 4.13[e]-[f]). The operations include underground and open pit mining of nickel-bearing sulfide ore, milling of ore, and above ground disposal of waste rock and mill tailings (id. at 4.13[d]).
According to Mr. Bittner, Vale Canada's expert, the pollution and potential contamination of third-party property for which Vale is legally liable under applicable law began to occur over 120 years ago and occurred consistently, year after year for an approximately 83 year period causing impacts to groundwater:
• My expert opinion, with the benefit of current-day scientific knowledge and data, is that impacts to groundwater at the Gertrude Mine and Creighton Mine from one or more constituents resulting from mining-related operations first occurred in 1903 and continued through 1986.
• Releases of constituents from source areas at the Gertrude Mine and Creighton Mine beginning in 1899 occurred consistently, year after year, and caused continuing impacts to groundwater from 1903 through 1986. As a result, my expert opinion, with the benefit of current-day scientific knowledge and data, is that constituents were leaching from [*7]mining-related wastes into water, year after year, during that timeframe. That water was infiltrating downward and mixing with groundwater consistently, year after year, during that timeframe. Thus, mining-related constituents were impacting groundwater consistently, year after year, during that timeframe, including by virtue of new/additional constituents mixing with groundwater, as well as by virtue of mining-related constituents impacting "new" (previously unimpacted) groundwater that migrated beneath the site.
(NYSCEF Doc. No. 1530 § 2.6). The continuous and systematic constituent impact caused by operations over an 83 year period is not Sudden and Accidental. 
(2) the Frood-Stobie Mine
The Frood-Stobie Mine includes the Frood, Stobie and Little Stobie Mines (NYSCEF Doc. No. 1524, Supplemental Interrogatory Response 4.14[e]). The Frood-Stobie Mine began operating open pit and underground mines approximately 140 years ago and ceased operations in approximately 2017 when Vale Canada commenced "care and maintenance of the mines" (id. at 4.14[e]-[f]). In addition to their mining operations, operations at the site included milling of ore and above ground disposal of waste rock and mill tailings (id. at 4.14[d]). According to Mr. Bittner, the pollution and potential contamination of third-party property for which Vale is legally liable under applicable law began to occur over 80 years ago and continued year after year for approximately 46 years resulting from operations causing impacts to groundwater:
• My expert opinion, with the benefit of current-day scientific knowledge and data, is that impacts to groundwater at the Frood-Stobie Complex from one or more constituents resulting from mining-related operations first occurred in 1940 and continued through 1986.
• Releases of constituents from source areas at the Frood-Stobie Complex beginning in 1940 occurred consistently, year after year, and caused continuing impacts to groundwater from 1940 through 1986. As a result, my expert opinion, with the benefit of current-day scientific knowledge and data, is that mining-related constituents were interacting with and impacting groundwater, year after year, during that timeframe including by virtue of new/additional constituents mixing with groundwater, as well as by virtue of mining-related constituents impacting "new" (previously unimpacted) groundwater near the facility.
(NYSCEF Doc. No. 1530 § 2.7). The continued release of constituents occurring consistent, year after year, in connection with operations over a 46 year period too can not be said to be Sudden and Accidental.
(3) the Central Tailings Area(the CTA)
The CTA is a "depository for waste materials, including tailings from Vale Canada's mining operations in the Sudbury Ontario area, as well as other waste materials from smelting and refining operations" (NYSCEF Doc. No. 1524, Supplemental Interrogatory Response 4.3[d]). The CTA began receiving tailings in 1928 and "has been progressively expanding ever since" (id. at 4.3[e]). Operations are schedule to cease in 2044 (id. at 4.3[f]). According to Mr. Bittner, the pollution and potential contamination of third-party property for which Vale is legally liable under applicable law began to occur over 90 years ago and continued year after [*8]year for 50 years resulting from operations causing impacts to groundwater:
• My expert opinion, with the benefit of current-day scientific knowledge and data, is that impacts to groundwater at the Central Tailings Area from one or more constituents emanating from mining-related operations first occurred in 1936 and continued through 1986.
• Releases of constituents from source areas at the Central Tailings Area beginning in 1936 occurred consistently, year after year, and caused continuing impacts to groundwater from 1936 through 1986. As a result, my expert opinion, with the benefit of current-day scientific knowledge and data, is that mining-related constituents were interacting with and impacting groundwater, year after year, during that timeframe including by virtue of new/additional constituents mixing with groundwater, as well as by virtue of mining-related constituents impacting "new" (previously unimpacted) groundwater near the facility.
(NYSCEF Doc. No. 1530 § 2.9). The consistent, year after year, release of contaminant for a 50 year period of time is also not Sudden and Accidental.
(4) the Copper Cliff Nickel Refinery(the CCNR)
The CCNR was built in 1954 and nickel operations commenced in 1973 (NYSCEF Doc. No. 1524, Supplemental Interrogatory Response 4.10[e]). However, in 1954, an iron ore recovery plant was active and iron from the smelting operation was process at the recovery plant (NYSCEF Doc. No. 1428). The iron ore recovery plant ceased operations approximately 45 years ago (in 1980), but nickel refinery operations continue to the present (NYSCEF Doc. No. 1524 at 4.10[e]-[f]). The CCNR includes "refinery processing tanks, pipes and ponds, waste rock disposal, and landfills." (id. at 4.10[d]). According to Mr. Brittner, the pollution and potential contamination of third-party property for which Vale is legally liable under applicable law also occurred in connection with normal operations over decades:
• My expert opinion, with the benefit of current-day scientific knowledge and data, is that impacts to groundwater at the Copper Cliff Nickel Refinery from one or more constituents resulting from mining-related operations first occurred in 1956 and continued through 1986.
• Releases of constituents from source areas at the Copper Cliff Nickel Refinery beginning in 1953 occurred consistently, year after year, and caused continuing impacts to groundwater from 1956 through 1986. As a result, my expert opinion, with the benefit of current-day scientific knowledge and data, is that constituents were leaching from mining-related wastes into water, year after year, during that timeframe. That water was infiltrating downward and mixing with groundwater consistently, year after year, during that timeframe. Thus, mining-related constituents were impacting groundwater consistently, year after year, during that timeframe, including by virtue of new/additional constituents mixing with groundwater, as well as by virtue of mining-related constituents impacting "new" (previously unimpacted) groundwater that migrated beneath the site.
(NYSCEF Doc. No. 1530 § 2.10). The consistent, year after year, release of contaminant over a [*9]30 year period too is not Sudden and Accidental.
(5) the Copper Cliff Copper Refinery(the CCCR)
The CCCR was built in 1929 (NYSCEF Doc. No. 1524, Supplemental Interrogatory Response 4.10[e]). The CCCR includes "refiner processing tanks and pipes, wastewater ponds, waste rock piles and a landfill" (id. at 4.9[d]). The CCCR was primarily a copper refining operation, but was also home to a silvery refinery, acid recovery plant and a selenium/tellurium plant (id. at 4.9[e]). Although certain operation processes have ceased, operations are ongoing and are scheduled to cease in 2044 (id. at 4.9[f]). According to Mr. Bittner, the pollution and potential contamination of third-party property for which Vale is legally liable under applicable law also occurred in connection with normal operations over an approximately 60 year period:
• My expert opinion, with the benefit of current-day scientific knowledge and data, is that impacts to groundwater at the Copper Cliff Copper Refinery from one or more constituents resulting from mining-related operations first occurred in 1929 and continued through 1986.
Releases of constituents from source areas at the Copper Cliff Copper Refinery beginning in 1929 occurred consistently, year after year, and caused continuing impacts to groundwater from 1929 through 1986. As a result, my expert opinion, with the benefit of current-day scientific knowledge and data, is that constituents were leaching from mining-related wastes into water, year after year, during that timeframe. That water was infiltrating downward and mixing with groundwater consistently, year after year, during that timeframe. Thus, mining-related constituents were impacting groundwater consistently, year after year, during that timeframe, including by virtue of new/additional constituents mixing with groundwater, as well as by virtue of mining-related constituents impacting "new" (previously unimpacted) groundwater that migrated beneath the site.
(NYSCEF Doc. No. 1530 § 2.11). The continued year after year release of constituent over a 60 year period is not Sudden and Accidental.
(6) the Port Colborne Refinery(the PCR)
The PCR operated as a refinery of nickel, cobalt and precious metals (NYSCEF Doc. No. 1524, Supplemental Interrogatory Response 4.20[d]). The PCR was built between 1916 and 1918 for nickel refining and precious metal extraction (id. at 4.0[e]). Electrolytic nickel refining operations occurred within the Electrolytic Nickel Refinery (the ENR). The ENR housed more than 1,600 electrolytic tanks and covered approximately five hectares (NYSCEF Doc. No. 1526, NY 00126253_00089). Sumps in the building's basement remained filled and were "often overflowing" with electrolyte during its operation period. In addition to the ENR, Buildings Nos. 1 and 2 also involved nickel refining (id. at NY00126253_00029) and unlined acid pit was located in Building No. 1 (id. at NY00126253_00091). According to Mr. Brittner, the pollution and potential contamination of third-party property for which Vale is legally liable under applicable law also occurred in connection with normal operations over an approximately 50 year period:
• My expert opinion, with the benefit of current-day scientific knowledge and data, is that [*10]impacts to groundwater at the Port Colborne Refinery from one or more constituents resulting from mining-related operations first occurred in 1938 and continued through 1986.
Releases of constituents from source areas at the Port Colborne Refinery beginning in 1922 occurred consistently, year after year, and caused continuing impacts to groundwater from 1938 through 1986. As a result, my expert opinion, with the benefit of current-day scientific knowledge and data, is that constituents were leaching from mining-related wastes into water, year after year, during that timeframe. That water was infiltrating downward and mixing with groundwater consistently, year after year, during that timeframe. Thus, mining-related constituents were impacting groundwater consistently, year after year, during that timeframe, including by virtue of new/additional constituents mixing with groundwater, as well as mining-related constituents impacting "new" (previously unimpacted) groundwater that migrated beneath the site.
(NYSCEF Doc. No. 1530 § 2.19).[FN14]
The release of constituents consistently year after year for approximately 50 years starting on or about 1938 is not Sudden and Accidental. Thus, Vale Canada does not present an issue of fact as to whether the Sudden and Accidental exception applies to the Pollution Exclusion as to this site either.
As discussed in the Prior Declaration, Vale Canada's initial corporate representative, Ms. Lanteigne, was not able differentiate between any of the routine spills which occurred over decades at any of the Test Sites:
Q: With regard to Copper Cliff smelter, what is the—is there a sudden and accidental event—and, again, when I say "sudden," I'm meaning abrupt in terms of time—event that took place at the Copper Cliff smelter that resulted in contamination for which Vale is currently seeking compensation from the insurers?
A: Well, I would say in this case of the smelter and because of the milling and the tailings areas as part of that — this footprint and this site now, I would say there were probably a number of pipeline breaks that would have resulted in spills, so that would be temporally abrupt. But, generally speaking, I think a lot of — most of the groundwater contamination or impacts would have been as a result of a longer term process of either acid mine drainage or metal leaching and leaching in general. So not temporally abrupt, but unexpected.
Q: You mentioned that there were probably pipeline breaks. As you sit here today testifying on behalf of Vale, are you aware of any kind of temporally sudden event that took place at Copper Cliff smelter that resulted in the contamination for which Vale is seeking to recover against the insurers?
A: I can't speak to a specific event. But I just know there have been events in the past that I'm aware of. Don't ask — I can't pinpoint when they happened, but there were frequent line breaks historically.
Q: A couple of questions on that. When were any of those line breaks, pipeline breaks? During what years did those take place?
A: I'm sorry, I'm saying I don't have the specific timelines. But with respect to the smelter, I'm not sure. I don't think we've recorded them. Just I know they exist and I think we identify line breaks as potential sources in our closure plans and groundwater studies as potential source of contamination, so — but I don't have specific dates for you.
Q: As you sit here today, does Vale have any evidence that there was any pipeline break during any policy period from 1968 to 1986?
A: As I sit here today, do I have the evidence? I don't aside from what I've read or — in the closure plans or groundwater studies.
(NYSCEF Doc. No. 694 at 296:16-298:22 [emphasis added]).
When questioned at his deposition, Mr. Smith, Vale Canada's second corporate witness, also could not differentiate among the spills or quantify their contribution to groundwater contamination (which spills according to Vale Canada's expert occurred after other spills and overflows had already consistently year after year occurred over decades):[FN15]

Q. Does Vale have any evidence that it can in any way establish particularly that the releases that they've identified in Exhibits 1 through 34 can be differentiated from any other 4 releases at the site into groundwater from times 5 prior to 1968?
. . .
THE WITNESS: No, I don't think we have the ability to differentiate between — between spills that occurred before and after this timeline that you're highlighting.
BY MS. KLINGER:
Q. I'm not just talking about spills. I'm talking about any type of releases of electrolyte materials that contribute to the groundwater contamination at the Port Colborne site if you understand that as part of the basic framework. Does Vale have any evidence that it can differentiate between the spills that it outlines in Exhibits 1 through 34 of your affirmation from any and all releases of electrolyte materials that contribute to the groundwater contamination at the Port Colborne site?
. . .
THE WITNESS: No, I don't think we do.
BY MS. KLINGER:
Q. Okay. And is your answer the same with respect to any releases of electrolyte materials after 1985?
THE WITNESS: I don't think we can differentiate between those — those either.
BY MS. KLINGER:
Q. As you sit here today as Vale's corporate designee, can you in any way quantify the amount of materials that contributed to the groundwater contamination in any particular year?
. . .
THE WITNESS: No.
(NYSCEF Doc. No. 1523 at 954:25-957:5 [emphasis added; objections and readbacks omitted]). 
Additionally, Mr. Smith concedes that the groundwater either was polluted and contaminated or would have been even without the spills which occurred starting in 1969 (again, decades after Mr. Bittner indicates that the contamination began to occur year after year):
Q. So maybe if I work it a little bit backwards. Has any effort been undertaken by Vale to understand whether but for the specific spills that are identified in your affirmation, would the groundwater be contaminated at the remaining sites?
. . .
[readback provided]
THE WITNESS: So you're asking if we exclude the spills, would groundwater still be contaminated at the sites if we exclude the impact of the spills?
Q. Yes, sir.
A. Yes, the groundwater would be impacted.
(NYSCEF Doc. No. 1522 at 442:16-443:11). 
In support of their position that the Prior Declaration applies and that they are entitled to a declaration that the Pollution Exclusion bar Vale Canada's claims for insurance coverage at the Remaining Sites, North River and US Fire argue, among other things, that (i) Vale Canada fails to meet its burden in demonstrating that a Sudden and Accidental release of pollutant occurred [*11]which causedproperty damage, (ii) the Prior Declaration relying on Northville Indus. Corp. v National Union Fire Ins. Co. of Pittsburgh, Pa., 89 NY2d 621 (1997) holds that the policyholder bears the burden to demonstrate a "discharge of the pollutant abruptly, precipitantly or brought about in a short time" (id. [emphasis in original]) such that the "temporal aspect of the sudden discharge element would only be met by the discharge, abruptly or within a short timespan, of a significant quantity of pollutant sufficient to have some potentially damaging effect (id. at 634), (iii) Ms. Lanteigne already conceded that the type of leaching and acid mine drainage that forms the basis for Vale's claims is not temporally abrupt (NYSCEF Doc. No. 694 at 246:9-11; id. at 244:13-14; id. at 246:24-247:3), (iv) Quentin Smith, Vale Canada's replacement corporate representative, is also unable to create an issue of fact that any temporarily abrupt releases caused the property damage during the North River and US Fire Policy Periods (NYSCEF Doc. Nos. 1428, 1522-1523) and the exhibits to Mr. Quentin's affirmation (more than half of which pertain to the PCR) do not address whether the spills actually caused the groundwater contamination (or whether it was in fact already contaminated) (NYSCEF Doc. No. 1411), (v) all of the alleged releases at the other Remaining Sies occurred after the expiration of the US Fire Policies in 1973, and (vi) Mr. Bittner's concedes that drips, spills and overflows were a routine part of the electrorefining process at the PCR which are not "sudden."[FN16]

In their opposition papers, among other things, Vale Canada argues (i) that they have 64 exhibits of spills and releases at the Remaining Sites which they argue are sudden and accidental, (ii) Lisa Lanteigne did not testify as to the Remaining Sites she only testified as to the Test Sites and Mr. Smith's testimony they argue is quite different because he says that the exhibits show temporally abrupt releases, (iii) the spills were not routine and part of Vale Canada's ongoing business, and (iv) they are now entitled to a choice of law determination based on the affirmation of the Hon. Beverley McLachlin (NYSCEF Doc. No. 1575) who never reviewed the sites at issue and does not offer an opinion as to whether the concurrent causation analysis which exists under certain circumstances pursuant to Canada law in fact applies to the instant case.[FN17]
Their arguments all fail.
DISCUSSION
On a motion for summary judgment, the movant "must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the [*12]absence of any material issues of fact" (Alvarez v Prospect Hosp., 68 NY2d at 324, citing Winegrad v New York Univ. Med. Ctr., 64 NY2d 851, 853 [1985]). The proponent of a summary judgment motion carries the initial burden to make a prima facie showing of entitlement to judgment as a matter of law (id. at 324), and failure to make such a showing requires denial of the motion (id.). Once this showing has been made, the burden shifts to the party opposing the motion to produce evidentiary proof in admissible form to establish the existence of material issues of fact requiring trial (id.). While the facts must be viewed in the light most favorable to the non-moving party, bald, conclusory assertions or speculation and a shadowy semblance of an issue are insufficient to defeat summary judgment, as are merely conclusory claims (Stonehill Capital Mgt., LLC v Bank of the W., 28 NY3d 439, 448 [2016]).
I. There are No Issues of Fact that the Sudden and Accidental Exception to the Pollution Exclusion Does Not Apply
As discussed above (and in the Prior Declaration), under New York law, an insurer bears the initial burden of demonstrating that the underlying property damage in a claim is "attributable to the discharge or release of a pollutant into the environment" (Northville Indus. Corp. , 89 NY2d at 628, 634 ). Once the insurer makes this showing, "the burden shifts to the insured to demonstrate that the discharge was sudden and accidental" (id. at 634). North River and US Fire have met their initial burden of demonstrating that the underlying property damage is attributable to the discharge or release of a pollutant into the environment.
As in the Prior Declaration, the critical issue is whether the Sudden and Accidental Exclusion applies. As discussed previously, spillages occurring as a part of routine business operations are not sudden and accidental (Northrop Grumman Corp., 3 F Supp 3d at 111). Any process that occurs slowly and incrementally over a relatively long time, no matter how unexpected or unintended the process, can never be called "sudden" (Northville Indus. Corp., 89 NY2d at 633). On the record before the Court, this is exactly what occurred. There are no issues of fact to the contrary. Accordingly, North River and US Fire are entitled to summary judgment.
II. The Concurrent Causation doctrine Is Not Applicable
CPLR 4511 gives courts substantial flexibility in determining whether to take judicial notice of foreign law and ascertaining its content (Eccles v Shamrock Capital Advisors, LLC, 42 NY3d 321, 341 [2024]). A court must take judicial notice of foreign law upon request and if the court is furnished with sufficient information to do so; otherwise, a court may take judicial notice of foreign law in its discretion (id.; Gowen v Helly Nahmad Gallery, Inc., 60 Misc 3d 963, 992 [Sup Ct 2018], affd, 169 AD3d 580 [1st Dept 2019]). 
In support of their motion seeking judicial notice of the concurrent causation doctrine, as discussed above, Vale Canada adduces the Affirmation of the Hon. Beverley McLachlin. In fact, and as discussed above, she was retained to offer two opinions: (i) "where occurrences are partly within coverage and partly excluded does Ontario law allow coverage of loss?", and (ii) "is coverage provided even if the excluded cause of loss is more proximate or preponderates over the other causes?" (NYSCEF Doc. No. 1575 ¶ 6). She was not retained to offer an opinion as to whether the concurrent causation doctrine applies to the facts in this case. Review of her affirmation discussed below confirms that it does not:
16. The first step in Ontario law is to identify the causes of the occurrence and determine [*13]if these causes are concurrent.
17. In this case, the two causes of the loss or occurrences at issue are first, gradual discharge from waste impoundments, etc., and second, sudden and accidental discharge. The question therefore is whether an Ontario court would find these two causes to be concurrent causes of the loss or occurrence, as contrasted with separate causes each producing its own identifiable loss.
18. Causes are concurrent where each cause is a stand-alone act capable of supporting a separate and distinct legal claim and each contributes to a single identifiable loss or occurrence. If one cause of loss is covered but the other is excluded, the problem of concurrent causes and how to treat them arises.
19. To determine concurrency, courts examine the temporal and sufficiency dimensions of potential concurrent causes to determine if the causes are in some relevant temporal relationship with each other and if each are necessarily involved in the end result loss(see Ex. A, Derksen v. 539938 Ontario Ltd., 2001 SCC 72 at paras. 30-31, 37.
20. Causes of loss can be concurrent where they operate sequentially. The question is whether each cause was sufficient to cause some damage, and together they resulted in the loss or occurrence at issue. Unrelated causes should be excluded (see Ex. B, Pavlovic v. Economic Mutual Insurance Co (1994), 99 BCLR (2d) 298 at paras. 18-22, 25-26).
21. Thus, two causes of loss would be treated as concurrent causes in Ontario law where: (a) they have combined to create the same contamination; (b) each cause supports an independent cause of action — one for negligently discharging deleterious substances, and the other for negligence resulting in sudden accidents; (c) the two causes interacted interdependently to give rise to the loss or occurrence — contaminated ground water, the occurrences of loss at issue; and (d) each cause was capable of causing some loss and together they established the loss at issue. On the other hand, the causes would not be treated as concurrent if they were two distinct causes, each of which gave rise to a separate loss.
(NYSCEF Doc. No. 1575 ¶¶ 16-21 [emphasis added]). 
Based on the foregoing, Vale Canada's suggestion that concurrent causation analysis applies to a situation involving the release of constituents which occurred consistently, year after year, and caused continuing impacts to groundwater over decades from operations and then subsequently (i.e., as opposed to sequentially as part of a necessary chain of events needed to cause property damages [Pavlovic v. Economic Mutual Insurance Co (1994), 99 BCLR (2d) 298 at paras. 18-22, 25-26])[FN18]
where many subsequent spills and overflows occurred, the impact of [*14]any of which can not be quantified is simply not correct and not what the Hon. Beverely McLaughlin indicates either. As discussed above, review of the case law also does not support this interpretation of Ontario Law for a number of different reasons, including, that each potential concurrent cause must be necessary to cause the occurrence. According to Vale Canada's expert, Mr. Bittner, this was not the case. Thus, and in contrast to the case at nisi prius, [*15]Pavlovic involved a sequence of related events leading to property damage over a relatively short period of time. As discussed above, according to the Hon. McLachlin, "[u]nrelated causes should be excluded" in determining concurrent causation (NYSCEF Doc. No. 1575 ¶ 20). Accordingly, the motion is DENIED.
Accordingly, it is hereby ORDERED that North River and US Fire's motion (Mtn. Seq. No. 038) for summary judgment is granted; and it is further
ORDERED that Vale Canada's motion (Mtn. Seq. No. 036) for judicial notice is denied; and it is further
ORDERED that North River and US Fire may submit judgment.
DATE 10/10/2025
ANDREW BORROK, J.S.C.

Footnotes

Footnote 1:As discussed below, the 64 exhibits attached to Quentin Smith's affirmation (which span from 1969 to 1985) do not suggest otherwise or create an issue of fact for at least three reasons. First, they all post-date by decades the time in which Mr. Bittner says in his report that routine, year after year, routine operations caused contamination of the ground water at each of the Remaining Sites. Second, the exhibits confirm that the spills (which spills post date the time Vale Canada's expert, Mr. Bittner, indicates that operations caused the property damage) were not sudden and accidental (despite Mr. Smith's ipse dixit assertions which are inconsistent with Vale Canada's expert, Mr. Bittner's report). They were routine. See Northrop Grumman Corp., 3 F Supp at 110). Third, none of the exhibits indicate (and Mr. Bittner says otherwise in his report), that any of the spills are what caused the property damages to have occurred. Operations had already caused the groundwater to be polluted and Vale Canada has no evidence whatsoever that without these spills the pollution would not have occurred. In fact, according to Mr. Bittner, damage was already done and continuing to be done.

Footnote 2:As discussed below, the Hon. Beverley McLachlin, Vale Canada's expert on the concurrent causation doctrine, did not review the Remaining Sites and offers no opinion as to whether concurrent causation doctrine applies to the facts in this case. In fact, and as discussed below, her affirmation confirms that the doctrine does not apply. 
Additionally, Vale Canada concedes (tr. 10.3.25) that Mr. Bittner can not model decades of time in which he indicates routine, year after year, spills occurred (such that he can establish a baseline based on any facts given the lack of documentation) all of which predate the time in which he might be able to model. He does not know and no one knows or can know when contamination violated regulatory standards at any of the sites. Indeed, and even as to the subsequent spills which occurred after the decades of time where Mr. Bittner indicated continuous, year after year damage occurred, Mr. Bittner acknowledged that he could not quantify the impact of the subsequent spills on the ground water, or even determine if there was any impact at all:
Q: If you go up to Spills, so the paragraph 8 above "Summary of Spills," and you see the bottom line says, "Port Colborne," and it has the number 3 next to it. Do you see that?
A: I do.
Q: So, is it your opinion that that reference, three spills at Port Colborne, with no further information, and certainly not the information you mentioned a minute ago, you would unable to determine what impact, if any, these three spills at Port Colborne had to the quality of the groundwater?
. . .
A: Yeah. Those three spills that are listed there, I believe, are the same three that are listed lower on the page for the third quarter. But, yes, I don't have any other information about, you know, what these spills were or where they were or what the characterization was, that's correct.
Q: And as a result, you would not be able to opine on what impact, if any, those three spills had to the quality of the groundwater at Port Colborne, correct?
. . .
A: Yeah, I think all I can, you know, conclude is that there are spills that occurred, you know, during the third quarter of 1980. But, you know, the effect of those spills on groundwater with the information that's contained here, I would be unable to, you know, determine what that impact on groundwater was.
Q: Or if there was any impact on groundwater, correct?
A: I would be unable to determine if there was an impact or what that impact was. There is just not enough information here to do that.
(NYSCEF Doc. No. 1521, at 37:13-38:3 [objections omitted]).

Footnote 3:See, e.g., NYSCEF Doc. No. 1520 at 127:2-17 (CTA); 282:19-24 (CCCR); 343:10-344:13(CCNR); NYSCEF Doc. No. 1521 at 98:3-17 (PCR); NYSCEF Doc. No. 1522 at 447:7-15; NYSCEF Doc. No. 1520 at 38:12-39:5.

Footnote 4:In the case pending before the Ontario court, Vale Canada served a rebuttal report from Mr. Bittner "who identified over 790 purported spills/releases at the Remaining Sites over a small fraction of the total years of operations" (NYSCEF Doc. No. 1604 ¶ 7). This in and of itself demonstrates that spills, overflows, and leaks were commonplace. In fact, at the PCR, there were over 80 spills in less than a three year period and at the CCNR, there were 42 spills in the fourth quarter of 1974, 41 during the second quarter of 1975 and 43 in the third quarter of 1975 (NYSCEF Doc. No. 1604, citing NYSCEF Doc. No. 1527).

Footnote 5:Additionally, the Court notes that Vale Canada appears to be fabricating that the basis for the denial of coverage is that an uncovered cause as to the pollution occurred (i.e., acid rock drainage) and that the Insurers are denying coverage on that basis so that it can again suggest that there is a choice of law issue here. The Insurers are not denying coverage based on identifying a particular cause of pollution and saying that it is a non-covered cause and ignoring that other potential concurrent causes may exist. The Insurers deny overage based on the Pollution Exclusion and the fact that Vale Canada fails to establish and can not establish that the property damage was caused by a Sudden and Accidental occurrence.

Footnote 6:Accord NYSCEF Doc. No. 1521 at 379:16-380:6. Indeed, where the damage has occurred by virtue of an excluded event, a subsequent event can not be a "concurrent" cause of the harm because the harm is already done. Cont'l Ins. Co. v Chenoil Cop., No. C 88 0085 THE 1988 WL 156750, at *2 (N.D. Cal. June 2, 1988).

Footnote 7:In the Prior Declaration, the term the Insurers was defined as Travelers Casualty Surety Company, together with North River and US Fire. Terms used in this Decision and Order but not otherwise defined shall have the meaning ascribed thereto in the Prior Declaration.

Footnote 8:Since the filing of the summary judgment motions, Vale Canada has supplemented its Interrogatory Response No. 1(f) to incorporate the Affirmation of Quentin Smith, dated March 31, 2025. The "property damage" and "occurrences" identified remains unchanged. To wit, Vale Canada identifies the "property damage" as "suspected property damage to soil and groundwater caused by the releases of contaminants from slag piles, tailings impoundments or piles and exposed surfaces, and from releases from places of containment such as pipelines, ponds, and equipment, including continuing contamination of soil, groundwater and surface water through precipitation, runoff and seepage." (NYSCEF Doc. No. 1524 [1][b]). According to Vale Canada, "[t]he occurrence that forms the basis for the Claim is the process of suspected contamination described in (b) above, which was a continuous or repeated exposure to conditions from approximately the start of operations at each site through the present day . . . " (id. at 1[d]).

Footnote 9:At the time of the filing of the summary judgment motions in respect of the Prior Declaration, Vale Canada had designated Lisa Lanteigne as its representative. Ms. Lanteigne is no longer employed by Vale Canada and Quentin Smith has been named as Vale Canada's corporate representative. As discussed below, he both has no personal knowledge of the historical operations that led to the decades of pollutant release at the Remaining Sites (hereinafter defined) or the impact of any subsequent spills (see, e.g., Smith Deposition, NYSCEF Doc. No. 1522 at 417:10-418:25). In fact, according to Vale Canada, the only evidence of any "sudden and accidental release" are within the exhibits attached to Mr. Smith's Affirmation (NYSCEF Doc. No. 1525, RFA 17-22). Nothing in the exhibits or that Mr. Smith testified to creates an issue of fact as to whether North River and US Fire are entitled to summary judgment and a declaration that the Pollution Exclusion applies to the Remaining Sites and that the Sudden and Accidental Exception does not.

Footnote 10:As discussed in the Prior Declaration, in Zatko, the Ontario trial court held that the subsequent leak which occurred over a lengthy period of time such that the Patersons (the insured) completed whatever remediation they deemed appropriate and that the resulting consequential damage could no longer be considered Sudden and Accidental.

Footnote 11:See NYSCEF Doc. No. 1536 n 1.

Footnote 12:See Supplemental Order (the Supplemental Order; NYSCEF Doc. No. 1501), dated May 9, 2025, reflecting the parties' stipulation that the Prior Declaration applies to the Stipulated-To Sites as such term is defined the Supplemental Order which Supplemental Order was entered without prejudice to Vale Canada's right to appeal the Declaration or the Supplemental Order.

Footnote 13:A stipulation of partial discontinuance (NYSCEF Doc. No. 1610) was filed as it relates to Travelers claims in this case.

Footnote 14:Mr. Bittner produced a second report in this case. That report is dated June 9, 2025. This report unlike his first report only addresses the PCR and not the rest of the Remaining Sites and only for the time period beginning in 1969 but not as to the 30 years that he previously indicated in his initial report occurred "consistently, year after year, and caused continuing impacts to groundwater from 1938" (NYSCEF Doc. No. 1527 at 4, 6). Thus, this too does not present an issue of fact because Mr. Bittner can not model the 30 years before any of the recorded spills as of 1969 or indicate that the property damage had not already occurred by 1969. In fact, he suggests the opposite is true — ("I expect that similar accidents occurred in the decades before formal reporting procedures were adopted") (id.).

Footnote 15:Vale Canada's contention that the spills in the affirmation of Mr. Smith (NYSCEF Doc. No. 1428) were sudden and accidental is belied by the record. The summary chart of spills referenced in the Smith Affirmation (NYSCEF Doc. No. 1599) shows that there have been at least 349 spills/releases at the Remaining Sites from 1969 to 1985, which amounts to an average of over 20 spills per year at one of the Remaining Sites. Additionally the Court notes that multiple remediation efforts are described as to these continuous, year after year spills and overflows including an improved dam (NYSCEF Doc. No. 1436), an additional automatic pump (NYSCEF Doc. No. 1438), a locking system (NYSCEF Doc. No. 1439), alarm inspections (NYSCEF Doc. No. 1441), heightening of the shutdown threshold of a site (NYSCEF Doc. No. 1446), and the installation of a lock and "blank" at a pump (NYSCEF Doc. No. 1452). The May 16, 1969 report (NYSCEF Doc. No. 1429) recommends five types of corrective action. The December 27, 1974 incident report describes eight types of corrective action "taken and planned" in response to a spill (NYSCEF Doc. No. 1450). No documentation is provided for the year after year decades of time that Mr. Bittner explains occurrences of pollution damage to the groundwater occurred. It is thus irrelevant that Mr. Smith now and following the Court's rejection of Vale Canada's position that Sudden and Accidental does not include a temporal element that he now calls these later hundreds of spills and overflows temporarily abrupt (see Northrop Grumman Corp., 3 F Supp 3d at 109; Travelers Indemnity Co. v Orange & Rockland Utils., Inc., 905 NYS.2d 11, 13 [1st Dept 2010]).

Footnote 16:NYSCEF Doc. No. 1521 at 145:13-15 (Bittner Tr.) ("I would call the dripping and the spilling you described of that process under the floors as a release"); 178:12-16 ("I certainly would not be surprised if there were releases that occurred over time onto the — onto the basement floor. That would — that would not surprise me at all."); 183:4-7 "Those releases happen from a number of different mechanisms. It's the spills, it's the drips, it's the overflows that go onto the basement floor").

Footnote 17:In fact, the Hon. Beverely McLachlin was retained to opine as to only (i) "where occurrences are partly within coverage and partly excluded does Ontario law allow coverage of loss?", and (ii) "is coverage provided even if the excluded cause of loss is more proximate or preponderates over the other causes?" (NYSCEF Doc. No. 1575 ¶ 6).

Footnote 18:In Pavlovic, the rupture of the domestic water service line ruptured causing damage to the soil supporting the foundation of a residence that was connected to the city watermain (99 BCLR ¶¶ 1-2). The homeowners' policy was an "all risks" policy that contained an exclusion for loss or damage "caused by seepage or leakage of water below the surface of the ground" (id. ¶ 7). The policy had an exception to the exclusion for "accidental discharge or overflow of water or steam from within a [plumbing system]" and "sudden and accidental bursting, tearing apart, cracking, burning or bulging due to the pressure of water or steam, or lack of water or steam in a [plumbing system]" (id. ¶ 12-13). The court considered whether the proximate cause of the damage was the (i) rupture, bursting or cracking of water service line, and the consequent accidental discharge of water, such that the exclusion applied, or (ii) seepage and leakage of water into the foundations of the residence, such that the exception to the exclusion applied. The court ruled that "a chain of physical events" led to the damage such that it could be traced back to the initial rupture:
18. It is clear from the evidence, and from the trial judge's findings, that a chain of physical events led to the appellants' damages. The house was built on a site where the soils were "... very loose to loose layered colluvium consisting of widely varied mixtures of silt, sand and gravel". The water service line failed, allowing water to escape into the ground. The escaped water migrated or percolated through the soils to the area underlying the north foundations of the appellants' home. The wetted soils became densified and collapsed. The void created by the collapsed soils allowed the house to settle. The soil no longer provided support to the foundation. Uneven settlement of the house caused it to distort, and thus to be damaged.
19. Looking at this whole chain of events, beginning with the failure of the pipe, to the settlement and damage of the house, it is evident that the migration or percolation of water was one of several necessary links in the chain of causation. Equating migration or percolation of water through the soil with "seepage" or "leakage", as I think one may, one could say that the loss or damage was caused by the excluded event. To do so, however, is to select as the cause of the loss, only one event in the causal chain.
. . .
21. In these circumstances, I do not think one can fairly say that the appellants' loss and damage were "caused by" the leakage of water below the ground. At most all one can say is that the leakage of water was an indirect cause of the loss, and one of many other contributing causes.
22. It would be more accurate to say that the loss was caused by the whole chain of events, of which leakage of water underground was a contributing or indirect cause, and that the chain of events was set in motion by the rupture or failure of the water service line from an unknown cause.
(id. ¶¶ 18-22). As discussed above, review of the Hon. Beverely McLaughlin affidavit makes clear, the Pavlovic analysis is simply inapposite. There is simply no evidence that the property damage at issue at the Remaining Sites was caused by a whole chain of events over a temporally discrete period of time. Indeed, as Vale Canada's expert Mr. Bittner makes clear, the property damage at issue at the Remaining Sites occurred as the result of year after year operations (Travelers Indem. Co. v Northrop Grumman Corp., 3 F Supp 3d at 110).